UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :

UNITED STATES OF AMERICA         :

                                    :

    -v.-                            :       S9 10 Cr. 228 (LTS)

                                    :

IRWIN LIPKIN,               :

                                    :

                     Defendant.     :

                                    :

---------------------------------------------------------------x


## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>


                                            PREET BHARARA
                                            United States Attorney
                                            Southern District of New York
                                            Attorney for the United States of America


David M. Abramowicz
Assistant United States Attorney
- Of Counsel -

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................................ 1

    A.   Offense Conduct .............................................................................................................. 1

        1.   The Scheme to Create False and Misleading Books and Records ................................. 2

        2.   The Scheme to Create False and Misleading SEC Filings............................................. 2

        3.   The Scheme to Create False Documents to Mislead Tax Auditors................................. 3

        4.   The Creation of Sham Trades in Lipkin's Investment Accounts .................................... 3

        5.   The No-Show Jobs for Lipkin and His Wife.................................................................. 4

    B.   Procedural History .......................................................................................................... 5

DISCUSSION................................................................................................................................ 6

    A.   Application of Sentencing Guidelines ............................................................................ 6

        1.   The Stipulated Guidelines Sentence of Ten Years' Imprisonment Accurately Reflects the Seriousness of Lipkin's Offenses ...................................................................................... 7

        2.   Lipkin's Physical Condition Warrants a Departure from the Stipulated Guidelines Sentence Pursuant to Section 5H1.4.................................................................................. 8

    B.   The Court Should Sentence Lipkin to a Term of Imprisonment ...................................... 9

        1.   Lipkin Bears Considerable Responsibility for the Madoff Securities Fraud .................. 9

        2.   Lipkin's Physical Condition and Other Circumstances the Defense Identifies Do Not Justify a Non-Custodial Sentence...................................................................................... 11

CONCLUSION............................................................................................................................. 13

SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                         :

UNITED STATES OF AMERICA           :

                                        :

    -v.-                               :         S9 10 Cr. 228 (LTS)

                                        :

IRWIN LIPKIN,                     :

                                        :

                    Defendant.     :

                                        :
------------------------------------------------------------------x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the

sentencing of defendant Irwin Lipkin ("Lipkin"), scheduled for August 5, 2015, at 2:00 p.m.

Lipkin pleaded guilty in November 2012, pursuant to a plea agreement, to conspiracy to commit

securities fraud, falsify records of a broker-dealer, falsify records of an investment adviser, make

false filings with the SEC, and falsify statements in relation to documents required by ERISA, in

violation of Title 18, United States Code, Section 371; and falsification of statements in relation

to documents required by ERISA, in violation of Title 18, United States Code, Sections 1027 and

2.  For the reasons set forth below, the Government submits that the Court should impose a

below-Guidelines sentence, but one that includes a term of imprisonment.

## BACKGROUND

### A.     Offense Conduct

Lipkin worked at Bernard L. Madoff Investment Securities and its predecessor, Bernard

L. Madoff Securities LLC (collectively and separately, "BLMIS"), from 1964 until his

retirement in 1998.  He was the first outside employee Bernard L. Madoff hired to work at

BLMIS, and the third employee overall after Madoff and Madoff's wife.  Lipkin served as

BLMIS's Controller, which gave him responsibility for maintaining the internal books and

records of BLMIS, including the General Ledger, Stock Record, and Financial and Operational

Combined Uniform Single Reports ("FOCUS Reports").  Among other duties, Lipkin assisted

Bernard L. Madoff in performing internal audits of the securities positions BLMIS purportedly

held.  (Information S9 10 Cr. 228 (LTS) ("Inf.") ¶ 10; Pre-Sentence Investigation Report dated

July 28, 2015 ("PSR") ¶ 36).

       1.     The Scheme to Create False and Misleading Books and Records

Lipkin engaged in a decades-long scheme to create false and misleading entries in

BLMIS documents in order to manipulate BLMIS's profit and loss numbers ("P&L").  By the

mid-1970s, Lipkin was altering the P&L at Bernard L. Madoff's direction on an approximately

monthly basis.  As a result, BLMIS documents including the General Ledger, Stock Record, and

FOCUS Reports were chronically false and misleading.  Lipkin memorialized certain alterations

he made to BLMIS's books and records in a journal.  For example, he noted alterations he made

to the pricing of certain securities positions and the corresponding alterations Daniel Bonventre

made to the Stock Record.  When Lipkin retired from BLMIS in 1998, he instructed his

successor as the firm's Controller, Enrica Cotellessa-Pitz, how to manipulate BLMIS revenues in

order to achieve a particular P&L result.  (Inf. ¶¶ 15-18; PSR ¶¶ 42-44).

       2.     The Scheme to Create False and Misleading SEC Filings

As an SEC-registered broker-dealer since approximately 1960, BLMIS was required to

file FOCUS Reports on a monthly, quarterly, and annual basis, and to file annual financial

statements.  Those filings, which were submitted to regulators and provided to various

Investment Advisory ("IA") customers, reported information concerning BLMIS's assets,

liabilities, revenues, and expenses.  As Lipkin knew, however, the filed information failed to

reflect BLMIS's true P&L because it was derived principally from false and misleading P&L

entries Lipkin and others had made in BLMIS's General Ledger and Stock Record.  (Inf. ¶¶ 19-21; PSR ¶ 45).

### 3.      The Scheme to Create False Documents to Mislead Tax Auditors

From approximately 1991 through 2007, Bernard L. Madoff substantially under-reported his taxable income.  Because Madoff filed tax returns as a "sole proprietor," he reported BLMIS's trading profits and losses as "gross receipts."  Madoff directed his accountant, David Friehling, to report only a certain amount of income from BLMIS, and Friehling manipulated the "gross receipts" amount to meet Madoff's desired tax outcome.  The Internal Revenue Service ("IRS") and the New York State Department of Taxation and Finance audited Madoff numerous times.  When audits occurred, Madoff, Lipkin, and other co-conspirators created false, backdated BLMIS General Ledgers, Stock Records and/or additional reports derived from the General Ledger and Stock Record so the records would appear consistent with the false information in Madoff's tax returns.  For example, in connection with an IRS audit for tax year 1992, Lipkin revised BLMIS's 1992 General Ledger and/or its supporting books and records—years after the fact—to accord with the income Madoff had reported.  (Inf. ¶¶ 22-26; PSR ¶¶ 46-47).

### 4.      The Creation of Sham Trades in Lipkin's Investment Accounts

Lipkin and his wife maintained personal IA accounts at BLMIS.  In or about November 2001, their IA accounts reflected sales of 22,000 shares of Johnson & Johnson stock.  Those sales generated capital gains income of approximately $400,000, on which Lipkin was required to pay taxes.  In or about December 2001, Lipkin asked Annette Bongiorno, who managed his IA accounts, to generate a $400,000 loss for income tax purposes.  Bongiorno then revised Lipkin's IA account statements and canceled the sales of the 22,000 Johnson & Johnson shares well after

those sales had purportedly occurred.  Those changes reduced Lipkin's capital gains income for

2001 by $400,000, as Lipkin had requested.  (Inf. ¶ 27; PSR ¶ 48).

Likewise, on or about December 2, 2002, Lipkin asked Bongiorno to reflect losses in his

and his family members' IA accounts:

> Dear Annette,
> Please set up losses in the following accts:
> Irwin Lipkin 1-L0036  $125,000
> [ ] Lipkin  1-L0093  $40,000
> [ ] & [ ] Lipkin 1-L0094 $30,000
> These are about what each will need.  Thanks.
> I will see you in Florida next month. . . .
> Love, Irwin

Bongiorno again followed Lipkin's instructions.  She reflected the requested losses by

documenting purported purchases of shares of Micron Technology, Inc., near the monthly high

price, and purported sales of those shares near the monthly low price less than three weeks later.

These purported trades resulted in IA account losses for Lipkin and his two family members for,

respectively, $145,770, $41,925, and $31,605.  In reality, the trades never occurred.  Indeed, the

IA account statements reflected that the Micron shares had purportedly been purchased on

November 29, 2002—three days before Lipkin asked Bongiorno to create the losses.  (Inf. ¶¶ 28-

29; PSR ¶¶ 48-49).

5.      The No-Show Jobs for Lipkin and His Wife

Beginning in approximately 1978, Lipkin arranged to place his wife on the BLMIS

payroll even though she neither worked at nor performed services for the firm.  She appeared on

the payroll intermittently until approximately 2001, receiving a salary and benefits to which she

was not entitled.  Lipkin similarly agreed with others to keep himself on the BLMIS payroll after

he retired in 1998.  He then collected a salary and benefits to which he was not entitled—

including medical insurance for himself and his wife—until BLMIS collapsed.  (Inf. ¶¶ 30-31; PSR ¶ 50).

Lipkin thus caused BLMIS to create and disseminate false documents reflecting that he and his wife were employees.  For example, he caused BLMIS to submit false Annual Returns ("Forms 5500") concerning its employee benefit plan to the United States Department of Labor. Form 5500 is part of ERISA's overall reporting and disclosure framework, which is intended to ensure that employee benefit plans are operated and managed in accordance with prescribed standards, and that participants and beneficiaries, as well as regulators, have sufficient information to protect the participants' and beneficiaries' rights.  Further, Lipkin caused BLMIS to submit false documents to the third-party administrator of a BLMIS health care plan.  The documents stated, among other things, that Lipkin and his wife were BLMIS employees and thus eligible to participate in BLMIS's 401(k) plan, health care plan, and flexible spending account program.  As Lipkin knew, he and his wife were not entitled to those benefits.  (Inf. ¶¶ 32-33; PSR ¶ 51).

## B.    Procedural History

On November 8, 2012, Lipkin pleaded guilty before this Court to a Criminal Information charging him with one count of conspiring to commit securities fraud, falsify records of a broker-dealer, falsify records of an investment adviser, make false filings with the SEC, and falsify statements in relation to documents required by ERISA, and with one substantive count of falsifying statements in relation to documents required by ERISA.  (Inf. ¶¶ 1-43; PSR ¶¶ 1-3).

Pursuant to a plea agreement dated November 5, 2012 and executed November 8, 2012 ("Plea Agreement"), Lipkin and the Government stipulated to an applicable sentence under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") of the maximum 10 years'

imprisonment ("Stipulated Guidelines Sentence").  (PSR ¶ 6(k)).  Lipkin and the Government

agreed not to seek any departure or adjustment from the Stipulated Guidelines Sentence, with the

limited exception that Lipkin could seek a downward departure—which the Government

reserved the right to oppose—for health-related circumstances pursuant to Section 5H1.4 of the

Guidelines.  (PSR ¶¶ 6(l), 162).

The sentencing submission filed on Lipkin's behalf on July 24, 2015 ("Lipkin Mem.")

seeks such a departure from the ten-year Stipulated Guidelines Sentence, requesting that the

Court impose a probationary sentence based principally on "the extreme medical hardship that a

jail sentence would have on this Defendant."  (Lipkin Mem. 7).

The Probation Office recommends a sentence of time served, to be followed by

supervised release for one year, principally on the ground that Lipkin's "severe physical ailments

justify a non-custodial term."  (PSR 41-42).  The PSR states that "the best medical treatment

[Lipkin] can receive is from the physicians in the community who have treated him for years,"

and that "Lipkin's frail health would be further diminished if he is asked to navigate the

sometimes difficult path of obtaining consistent medical care in a correctional facility."  (PSR

42).

### DISCUSSION

While agreeing that a departure from the ten-year Stipulated Guidelines Sentence is

warranted pursuant to Section 5H1.4 of the Guidelines, the Government submits that a sentence

requiring Lipkin to serve some term of imprisonment would be appropriate.

**A.      Application of Sentencing Guidelines**

Under the Stipulated Guidelines Sentence as calculated in the Plea Agreement, which

applied the November 1, 2012 edition of the Guidelines, Lipkin is in Criminal History Category I

and has an adjusted offense level of 49.  (Plea Agreement 3).  The PSR, in contrast, sets forth a

calculation placing Lipkin in the same Criminal History Category, but with an offense level of

47.  (PSR ¶¶ 112, 115).  Under both calculations, the Guidelines call for a sentence of life

imprisonment, which exceeds the statutory maximum term.  Accordingly, the Guidelines

sentence is computed by adding the applicable statutory maximum sentences on all counts of

conviction, which results in a Guidelines sentence of ten years' imprisonment.  *See* 2012

U.S.S.G. § 5G1.2(d).  (PSR ¶ 149).

1.      The Stipulated Guidelines Sentence of Ten Years' Imprisonment Accurately Reflects the
        Seriousness of Lipkin's Offenses

        The Stipulated Guidelines Sentence of ten years reflects the seriousness of Lipkin's

conduct, including specific characteristics and aggravating factors that, as stipulated by the

parties, apply here.  Because each offense of conviction is fraud-related and grouped, Section

2B1.1 determines the applicable offense level.  Under Section 2B1.1, and including applicable

Chapter Three adjustments, the Stipulated Guidelines Sentence calculates Lipkin's offense level

of 49 as follows: a base offense level of 6 (2012 U.S.S.G. § 2B1.1(a)(2)); increased by 30 levels

because Lipkin's offenses involved a loss amount exceeding $400,000,000 (2012 U.S.S.G.

§ 2B1.1(b)(1)(P)); increased by 6 levels because the offenses involved 250 or more victims

(2012 U.S.S.G. § 2B1.1(b)(2)(C)); increased by 2 levels because the offenses, which included

Lipkin's creation of fraudulent documents such as FOCUS Reports, involved sophisticated

means (2012 U.S.S.G. § 2B1.1(b)(10)); increased by 4 levels[1] because the offenses substantially

---

[1]     This 4-level adjustment explains the discrepancy between the offense-level calculations
in the Plea Agreement and the PSR.  The PSR properly limited the adjustment for endangering
the solvency or financial security of 100 or more victims to 2 levels pursuant to the 2014
Guidelines edition's Section 2B1.1(b)(16)(C), which provides that "[t]he cumulative adjustments
from application of both subsections (b)(2) and (b)(16)(B) shall not exceed 8 levels."  The earlier
edition of the Guidelines relied on by the Plea Agreement contained a similar limitation.  *See*

endangered the solvency or financial security of 100 or more victims (2012 U.S.S.G.

§ 2B1.1(b)(15)(B)); increased by 4 levels because the defendant was associated with a registered

investment adviser or broker-dealer (2012 U.S.S.G. § 2B1.1(b)(18)(A)); and reduced by 3 levels

for Lipkin's acceptance of responsibility for his role in the offense (2012 U.S.S.G. § 3E1.1).

(*See also* PSR ¶¶ 97-112 (calculating a total offense level of 47)).

2.      Lipkin's Physical Condition Warrants a Departure from the Stipulated Guidelines
        Sentence Pursuant to Section 5H1.4

An exception to the Plea Agreement's language precluding the parties from requesting

departures from or adjustments to the Stipulated Guidelines Sentence allows Lipkin to seek a

departure pursuant to Section 5H1.4 "based upon his health-related circumstances." (Plea

Agreement 3-4). The Plea Agreement states that "the Government reserves the right to oppose

such an application." (Plea Agreement 4).

A defendant seeking a departure from the applicable Guidelines sentence "must provide

evidence that shows his situation is outside the heartland of the applicable guidelines" in order to

overcome "the general presumption" that his "circumstances are not unusual enough to justify

departure." *United States* v. *Leiva-Deras*, 359 F.3d 183, 193 (2d Cir. 2004). Section 5H1.4

provides, in relevant part, that a defendant's "[p]hysical condition or appearance, including

physique, may be relevant in determining whether a departure is warranted, if the condition or

appearance, individually or in combination with other offender characteristics, is present to an

unusual degree and distinguishes the case from the typical cases covered by the guidelines. An

extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a

seriously infirm defendant, home detention may be as efficient as, and less costly than,

2012 U.S.S.G. § 2B1.1(b)(15)(C). As a result of the parties' error, the Plea Agreement calculates
a total offense level of 49, while the PSR calculates a total offense level of 47. The PSR's
calculation is correct.

imprisonment." That language "restricts departures based on physical condition to defendants with an 'extraordinary physical impairment,' such as those which render a defendant 'seriously infirm.'" *United States* v. *Altman*, 48 F.3d 96, 104 (2d Cir. 1995) (quoting U.S.S.G. § 5H1.4). Accordingly, "[t]he standards for a downward departure on medical grounds are strict." *United States* v. *Persico*, 164 F.3d 796, 806 (2d Cir. 1999).

Based on the representations in Lipkin's sentencing submission as well as the findings in the PSR, Lipkin is in exceedingly poor health. (*See, e.g.*, PSR ¶¶ 128-134). This is therefore the rare case in which the defendant's physical condition merits a downward departure pursuant to Section 5H1.4.

**B.    The Court Should Sentence Lipkin to a Term of Imprisonment**

Although his physical condition warrants a departure from the ten-year Guidelines sentence, Lipkin should be required to serve some period of incarceration.

1.    Lipkin Bears Considerable Responsibility for the Madoff Securities Fraud

Year after year, decade after decade, Lipkin helped perpetrate crimes that victimized thousands of people and caused billions of dollars in damages. His conduct was central—not "peripheral," as his sentencing submission claims (Lipkin Mem. 2)—to the BLMIS fraud.

The record, including the allocution Lipkin made under oath when he pleaded guilty in November 2012, demonstrates that Bernard L. Madoff did not and could not perpetrate this fraud alone. Lipkin, the first outside employee BLMIS hired, contributed significantly to the scheme. Lipkin has admitted that, as Controller, he "was responsible for preparing and maintaining certain financial books and records," including FOCUS Reports filed with the SEC. Instead of protecting those records, he falsified them—with devastating consequences:

> While working for Bernie Madoff, I made accounting entries in financial records
> that I knew were inaccurate. Moreover, I knew the documents containing these

false entries were to be filed with various regulatory authorities.  These filings
helped Mr. Madoff run the Ponzi scheme that harmed thousands of people.

(Dkt. No. 288 ("Plea Tr."), at 30-31).  Lipkin also helped conceal the fraud, enabling it to reach

more victims.  When IRS auditors examined Bernard L. Madoff's false tax filings, Lipkin, by his

own account, "made revisions to the 1992 general ledger several years after the fact so

documents would appear to be consistent with Bernie's tax returns."  (Plea Tr. 32).

Greed motivated some of Lipkin's criminal conduct.  He directed Annette Bongiorno to

make "sham trades" in his own investment accounts "to enable me to reduce my long-term

capital gain" (Plea Tr. 32-33), and he took steps to keep himself and his wife on the BLMIS

payroll after his retirement "to enable both of us to appear eligible for continuing financial

perks" (Plea Tr. 30).

Troublingly, Lipkin's sentencing submission minimizes his conduct and dodges

responsibility.  Although Lipkin received an annual salary of approximately $225,000 as of 1998

and benefitted from a no-show job after his retirement (PSR ¶ 142), he asserts that he "never

earned a large salary or large amounts of monies or bonuses from BLMIS" (Lipkin Mem. 3).

Although he stipulated in the Plea Agreement that his offense involved 250 or more victims and

losses exceeding $400,000,000 (Plea Agreement 2), the only "victim" his sentencing submission

mentions is himself ("Irwin Lipkin firmly believes that he is a victim in this matter" (Lipkin

Mem. 7)), and his personal written statement to the Court bemoans his own financial and

medical hardships ("writing this letter, I was thinking of what I have gone thru" (Lipkin Mem.

Ex. 3)) without acknowledging the plight of others.

Lipkin also asserts that he was "not a conspirator in the larger fraud perpetrated by Mr.

Madoff" (Lipkin Mem. 5) and "had no knowledge of the massive fraud perpetrated by Bernard

Madoff" (Lipkin Mem. 2), even though Lipkin's own sworn statements demonstrate the extent of

knowledge he possessed about wrongdoing:

> THE COURT: You told me that you changed P&L numbers, that you put in stock record information that was wrong, and that you knew that documents you were putting that information into would be going to customers, going to the SEC under certain circumstances.  When you put those numbers in at Mr. Madoff's request or otherwise, did you know at the time that they were wrong, that they were false?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Are you sure? Are you sure that you knew they were false?  I am asking if you are telling me the truth on that.
>
> THE DEFENDANT: To my recollection, yes.
>
> THE COURT: Did you know that what you were doing was wrong and illegal at the time?
>
> THE DEFENDANT: Yes, your Honor.

(Plea Tr. 36-37).

Lipkin knew his conduct was wrong, yet continued to engage in it over a period of

decades.  The sentence imposed should reflect the seriousness of his crimes.

2.      Lipkin's Physical Condition and Other Circumstances the Defense Identifies Do Not
        Justify a Non-Custodial Sentence

Lipkin's poor health, as detailed in his sentencing submission and the PSR, merits a

downward departure pursuant to Section 5H1.4 of the Guidelines based on Lipkin's diminished

life expectancy and the added resources the Bureau of Prisons ("BOP") will likely need to spend

to care for him.  But the record does not support the defense submission's assertion that Lipkin

"is not a candidate for imprisonment."  (Lipkin Mem. 2).

Lipkin can and should be sentenced to a term of imprisonment even if the Court finds that

he qualifies for a departure based on his physical condition.  The defense's argument that Lipkin

11

"cannot walk across a prison yard for meals" or move to "any other part of the facility within a reasonable period of time as the prison schedule might demand" (Lipkin Mem. 4) rests on the false premise that BOP assigns inmates to particular facilities without regard to their medical needs.  In reality, BOP is equipped to identify and care for inmates with acute and chronic medical conditions.  As set forth in an outline provided by BOP and attached hereto as Exhibit A, BOP assigns inmates to facilities able to provide the necessary level of care, including, where needed, "CARE Level 4" facilities that accommodate inmates who "[m]ay need daily nursing care." (Ex. A at 2).  BOP medical centers routinely treat seriously ill patients, including inmates who require dialysis, chemotherapy, or hospice care.  BOP also contracts with local medical centers for circumstances that require more specialized medical treatment.

In addition to the departure based on his physical condition, Lipkin seeks what his submission describes as "downward departure[s]" based on his "acceptance of responsibility," his purportedly "peripheral" role in the offense, and his "age."  (Lipkin Mem. 2-3).

As an initial matter, these requests breach the Plea Agreement.  As noted above, the agreement states that other than Lipkin's right to apply for a departure pursuant to Section 5H1.4, "neither party will seek any departure or adjustment pursuant to the Guidelines," nor will either party "suggest that the Probation Office consider such a departure or adjustment under the Guidelines, or suggest that the Court *sua sponte* consider any such departure or adjustment." (Plea Agreement 2-3).

In any event, Lipkin's arguments are unavailing.  First, the Guidelines already credit Lipkin with a three-point reduction to his offense level for accepting responsibility through his

guilty plea.  (PSR ¶ 109).[2]   Second, the Guidelines calculation already accounts for Lipkin's role

in the offense.  (PSR ¶ 106).   Third, while Lipkin is indeed older than the average defendant,

that is the case largely because he and his co-conspirators succeeded in concealing their criminal

conduct for so many decades.

In sum, the circumstances present here do not justify a drastic departure from a ten-year

prison term to a non-custodial sentence.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose a

sentence on Irwin Lipkin that includes a term of imprisonment.

Dated: New York, New York
       July 31, 2015

                                          Respectfully submitted,


                                          PREET BHARARA
                                          United States Attorney


                                    by:  /s/ David M. Abramowicz
                                          David M. Abramowicz
                                          Assistant United States Attorney
                                          (212) 637-6525

---

[2]      Lipkin states he "did not earn a 5K letter"—*i.e.*, an application by the Government for a
downward departure under Section 5K1.1 based on a defendant's substantial assistance in the
investigation or prosecution of others—due solely to "his lack of knowledge[,] not his lack of
interest in aiding the government."  (Lipkin Mem. 7).  While "[a] defendant's refusal to assist
authorities in the investigation of other persons may not be considered as an aggravating
sentencing factor," U.S.S.G. § 5K1.2, the Government disputes any suggestion that Lipkin
assisted or attempted to cooperate with the Government to a degree that would warrant a
downward departure or variance.  Rather, Lipkin made no legitimate efforts to assist the
Government, and he pleaded guilty only after his son and others had pleaded guilty pursuant to
cooperation agreements.