F859LIPS

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         10 CR 228 (LTS)

5    IRWIN LIPKIN,

6                   Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         August 5, 2015
9                                        2:07 p.m.

10

     Before:
11
                    HON. LAURA TAYLOR SWAIN
12
                                         District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     DAVID ABRAMOWICZ
17   PAUL MONTELEONI
          Assistant United States Attorneys
18
     RICHARD P. GALLER
19        Attorney for Defendant

20

21

22

23

24

25
```

F859LIPS

1            (In open court)

2            THE COURT:  Good afternoon.

3            (Case called)

4            THE COURT:  Counsel, appearances please.

5            MR. ABRAMOWICZ:  Good afternoon, your Honor.  David

6    Abramowicz and Paul Monteleoni for the government.  We're

7    joined at counsel's table by special agent Paul Roberts of the

8    FBI.

9            THE COURT:  Good afternoon Mr. Abramowicz,

10   Mr. Monteleoni, and Special Agent Roberts.

11           MR. GALLER:  Hi, your Honor.  Richard Galler for the

12   defendant.

13           THE COURT:  Good afternoon, Mr. Galler.  And good

14   afternoon, Mr. Lipkin.

15           DEFENDANT LIPKIN:  Good afternoon.

16           THE COURT:  I understand there's a member of

17   Mr. Lipkin's family here.  Good afternoon.

18           MR. GALLER:  Yes.  His son is here, Mark.

19           THE COURT:  Good afternoon to Mark Lipkin and also to

20   the spectators and members of the press who are present.

21           We are here today for sentencing.  I have received and

22   reviewed the presentence investigation report which is dated

23   July 28, 2015, including the recommendation and addendum as

24   well as defense counsel's July 24, 2015 submission, which was

25   accompanied by two letters from family members in support of

F859LIPS

1    Mr. Lipkin, a physician's report concerning his medical

2    condition, a letter concerning a psychiatric examination, and a

3    letter from Mr. Lipkin himself.

4            I have also received and reviewed the government's

5    July 29, 2015 submission and a proposed consent order of

6    forfeiture which was executed earlier this month.

7            In addition, I have received a submission from the

8    victim witness coordinator under a cover letter dated July 27,

9    2015, which contained two victim impact statements, neither of

10   which mentions the defendant specifically.

11           I have also considered all of the Madoff Securities

12   victim impact statements that the Court has received in

13   connection with the earlier sentencings in this case.

14           Are there any other written submissions that the

15   parties intend me to have considered in connection with the

16   sentencing?

17           MR. ABRAMOWICZ:  There are not, your Honor, but just

18   to clarify that the government submission was dated July 31.

19           THE COURT:  Apologies.  I misnoted the date.  So it is

20   the July 31 submission.

21           MR. GALLER:  Nothing else, your Honor.

22           THE COURT:  Thank you.

23           Counsel may I just see you at the sidebar for a moment

24   concerning a filing.

25           (At the sidebar)

F859LIPS

1          THE COURT:  So, Mr. Galler, my law clerk told me that

2     everything has been filed on ECF in your submission including

3     the medical reports, they're all on the open record.  Is that

4     your intent?

5          MR. GALLER:  Yes, it was my intent, probably should

6     have sent one or two things under seal but that's okay.

7          THE COURT:  If you wanted to request that I withdraw

8     the full submission from ECF and permit you to file a redacted

9     version on ECF with the full version to be filed under seal in

10     order to protect the specific medical information and, for

11     instance, contact information for Mark Lipkin, I would

12     entertain such a request.

13          MR. GALLER:  I think that would be the appropriate

14     thing, yes.

15          THE COURT:  Then I will enter an order directing the

16     clerk to file under seal the current docket entry and will

17     expect that within the next 48 hours you'll send me another --

18     you'll file a redacted version and then I need another full

19     version for the filing under seal.

20          MR. GALLER:  And file that how?

21          THE COURT:  If you'd send it to the attention of

22     chambers, we'll --

23          MR. GALLER:  Hard copy?

24          THE COURT:  Yes.  We'll file the hard copy under seal.

25          MR. GALLER:  That's fine.

F859LIPS

1              THE COURT:  Thank you very much.

2              MR. GALLER:  Thank you, Judge.

3              (In open court)

4              THE COURT:  Mr. Abramowicz, will you summarize the

5     government's victim notification activities in connection with

6     this proceeding.

7              MR. ABRAMOWICZ:  Yes, your Honor.  The government

8     effected victim notification; did not receive any notices from

9     victims expressing a desire to be heard today.

10             THE COURT:  Thank you.

11             Mr. Galler, have you read the presentence report and

12    discussed it with Mr. Lipkin?

13             MR. GALLER:  I have, your Honor.

14             THE COURT:  And Mr. Lipkin, have you yourself reviewed

15    the presentence report?

16             DEFENDANT LIPKIN:  Yes, I have, your Honor.

17             THE COURT:  And have you discussed it with your

18    attorney?

19             DEFENDANT LIPKIN:  Yes, your Honor.

20             THE COURT:  Thank you.

21             I'd ask Mr. Monteleoni that you move one way or the

22    other so that -- thank you.  Now I'm able to see Mr. Lipkin.

23             MR. GALLER:  I'm sorry.  Mr. Lipkin just can't stand.

24             THE COURT:  I understand that.  And he was having to

25    move at an angle to be able to see me so I just wanted to make

F859LIPS

1   sure that he can and thank you Mr. Monteleoni and Special Agent

2   Roberts.  Sorry about the close quarters there with the chairs.

3               MR. MONTELEONI:  My apologies for obstructing your

4   view.

5               THE COURT:  All right.  We'll all in good shape now.

6               So Mr. Galler do you have any objections or other

7   issues with respect to the content of the presentence report

8   that you'd like to address at this time?

9               MR. GALLER:  I do not, your Honor.

10              THE COURT:  Thank you.

11              Mr. Abramowicz, does the government have any

12  objections or other issues with respect to the content of the

13  report?

14              MR. ABRAMOWICZ:  No, your Honor.

15              THE COURT:  Is the government applying to have

16  Mr. Lipkin credited with the third point for acceptance of

17  responsibility?

18              MR. ABRAMOWICZ:  Yes, your Honor.

19              THE COURT:  That application is granted and I note

20  that the third point is already incorporated into the

21  guidelines calculations in the presentence report.

22              Mr. Abramowicz or Mr. Monteleoni, would you please

23  summarize the provisions of the forfeiture order and explain

24  the basis of the money judgment computation.

25              MR. MONTELEONI:  Yes, your Honor.

F859LIPS

1          Thank you.

2          The forfeiture order is a document which provides for

3     a $170 billion money judgment as well as the forfeiture of

4     certain items of specific property and also the allocation of

5     other items of specific property to the bankruptcy trustee in

6     settlement of an adversary proceeding between the bankruptcy

7     trustee and certain of the Lipkins.  So it is a somewhat

8     lengthier and more complex forfeiture order, but it is a global

9     settlement document.  The basis for the money judgment

10    calculation is that it -- as the Court knows, Mr. Lipkin was

11    working at Madoff Securities for an especially long time.  So

12    it is an estimate of the amount of cash additions into the

13    Madoff Securities investment advisory business from the point

14    at which the parties agreed for the purposes of forfeiture he

15    can be reasonably estimated to have been aware of the risk of

16    loss to investors.

17          THE COURT:  Am I correct in understanding that there

18    are roughly deals with three groups of specific property?

19    There are assets that go to the trustee specifically, there are

20    assets that are forfeited, and there are certain assets that

21    are retained?

22          MR. MONTELEONI:  Well not retained by the defendant.

23    Any property of any sort retained by the defendant would be

24    subject to forfeiture as a substitute asset until the entire

25    money judgment is satisfied.

F859LIPS

1          However, the defendant's wife does have an interest in

2     certain portions of the investment account that either arise

3     from inheritance money or from money that came into the account

4     before the defendant's criminal conduct essentially.  So that's

5     the main basis for the property that's being retained by the

6     defendant's wife.

7          THE COURT:  Thank you.

8          Mr. Galler, am I correct in understanding that the

9     defense has no objection to the form or substance of the

10    proposed consent order of forfeiture?

11         MR. GALLER:  That's correct, your Honor.  We

12    negotiated at length with counsel who is here, Mr. Monteleoni,

13    and also we had long discussions with BakerHostetler, and we

14    had an in-person meeting with counsel for Mr. Lipkin and the

15    children and Carol in Mr. Monteleoni's office.  So we have no

16    objection.

17         THE COURT:  Thank you.

18         Mr. Lipkin, have you signed the consent order of

19    forfeiture.

20         DEFENDANT LIPKIN:  I'm sorry, your Honor?

21         THE COURT:  Have you signed the consent order of

22    forfeiture that has been proposed to me?  It is a 23-page

23    document dealing with the property and the liabilities that

24    Mr. Monteleoni has just discussed?

25         DEFENDANT LIPKIN:  Yes, your Honor.

F859LIPS

1          THE COURT:  Did you discuss it thoroughly with your

2     attorney before you signed it?

3          DEFENDANT LIPKIN:  Yes, I did, your Honor.

4          THE COURT:  Did you fully understand it before you

5     signed it?

6          DEFENDANT LIPKIN:  Yes, your Honor.

7          THE COURT:  Thank you.

8          I will enter the order in connection with this

9     proceeding after I impose sentence.

10          Before I hear the remarks of counsel and any downward

11     departure application I want to inform counsel that I am

12     considering including a mental health condition and am also

13     considering home confinement in connection with any potential

14     supervised release aspect of a sentence here.  And so to the

15     extent there are any objections or comments specific to those

16     types of special conditions which were not among the special

17     conditions proposed by the probation department I'd be grateful

18     to hear that in connection with the remarks of counsel.

19          So, with that, Mr. Galler, whenever you're ready I'll

20     hear your sentencing remarks.

21          MR. GALLER:  Thank you very much, your Honor.

22          Your Honor, I actually first met Mr. Lipkin at the

23     inception of this case, I think it's now 2008, six-and-a-half,

24     seven years ago.  He came, and I must say, stunned that this

25     occurred.  He was one of the first employees of the Madoff

F859LIPS

1     company.  Very young man.  His wife had worked there for a

2     short period of time.  And he knew Mr. Madoff as a virtual king

3     of Wall Street, someone who was well respected, well liked in

4     the industry.  And I'm sure your Honor knows far more than I

5     do, having sat through the long trial that you did last year.

6     Through the course of time Mr. Madoff asked my client to sign

7     certain documents which were certainly inappropriate.  My

8     client knows now after review with counsel that the documents

9     he signed with the SEC were not accurate and you can't sign a

10    document and send it to the government that's not accurate.

11            THE COURT:  Are you saying that Mr. Lipkin didn't know

12    that the documents were inaccurate when he signed them?

13            MR. GALLER:  He didn't.  He didn't know about the

14    greater fraud.  In other words, he knew that the documents

15    weren't accurate because he never checked.  So he certified to

16    certain statements to the SEC which he knew weren't accurate

17    because he didn't check, but he did not know about the greater

18    fraud of Mr. Madoff and didn't understand the underlying reason

19    of why Mr. Madoff wanted these documents signed.

20            So he's not making any excuses for his activities.  He

21    knows he should have checked further and he knows he shouldn't

22    sign documents without further checking as to their accuracy.

23            So, he came to our office actually initially to file a

24    suit against Mr. Madoff and be involved in the trustee issue to

25    try to get some money back.  And we investigated that aspect of

F859LIPS

```
 1    it and then the other criminal aspects came later.

 2            He certainly voluntarily entered a plea which goes

 3    back to 2012.  The government at that time understood that my

 4    client's health was not good and that was in 2012.  And I will

 5    tell you that his health has deteriorated since then.  He's

 6    lost 50 to 75 pounds.  He was relatively robust at the -- even

 7    at the 2012 sentence.  He does have haunch back.  But all of

 8    these other issues were more under control than they are now.

 9    As you can see, he's a frail gentleman who had a pacemaker

10    replaced as recently as Friday and that has caused some

11    concern.

12            So I bring that up because if you look at the statute

13    under the Sentencing Guidelines 5H1.4, physical condition, it

14    does indicate that a downward departure may be appropriate when

15    someone who is in the condition of my client may not be able to

16    manage the rigors of incarceration.  He not only has physical

17    infirmities but he's obviously frail and couldn't get around a

18    prison environment.

19            As your Honor knows --

20            THE COURT:  There are of course medical facilities

21    maintained by the Bureau of Prisons and so as indicated in the

22    classification list that the government filed there are

23    facilities in which someone would not have to engage in all of

24    the normal physical activities involved in being in prison.

25            MR. GALLER:  There are facilities that are -- I can
```

F859LIPS

only characterize them as not as good as the ones outside the

prison.

In addition, I can tell you this.  He can get an

ambulance in five minutes from his house.  There's a hospital

within a couple of miles of his house.  That can't be

accomplished in prison.  Those are just some of the

difficulties of the prison environment.  It's just the nature

of the setup.

In order to present the court with information I had

Dr. Goldstein, who is a psychiatrist who teaches at Columbia,

present the court with a report because I wanted your Honor to

know what his status was.  And clearly the doctor says that he

was a sad-looking elderly man who appears frail, infirm, and

older than his stated age and he believes that he suffers from

depression and needs psychiatric help in terms of long-term

psychiatric medication and help for his depression which, of

course, we know the onset of that, and he hasn't recovered from

it, and that includes being depressed over bringing his family

into this unfortunate situation.  Your Honor sentenced Eric,

his son, and is well aware of that situation.  But all of the

children worked at the firm summers and other times and

Mr. Lipkin was proud to bring his kids in to work, not knowing

about the greater fraud.  I then sent my client to see

Dr. Charash, who teaches at NYU, and he explained the details

of the physical condition of my client.  And I should note that

F859LIPS

```
 1    the physical condition and mental condition of my client is
 2    unopposed by the government.  I don't think there's any issue
 3    that they have regarding his condition.  So the question
 4    becomes what can we do with a gentleman in this state?
 5         Well the presentence report is fairly clear.  It
 6    states that there is no chance of recidivism and that his frail
 7    health would be further diminished if he is asked to navigate
 8    the sometimes difficult path of obtaining consistent medical
 9    care in a correctional facility.
10         So pretrial services are the people who have been to
11    my client's house.  They understand the setting.  They
12    understand that he does not leave the house except generally to
13    go to the doctor and walk around or go outside in the driveway
14    and come back home.  So he's housebound.  He has not been to my
15    office in quite some time.  I have to go to his house,
16    including Saturday when I went over the forfeiture agreement, I
17    did meet him, I did meet his wife there.  His wife is not here
18    today because of her prior stroke.  She's just incapable of
19    dealing with this situation.
20         So, all in all, I think if you look at the medical
21    reports and the presentence report recommendation, I think
22    having him comply with psychiatric review, mental health exam
23    is appropriate -- well the exams have been done.  He needs
24    mental health treatment.
25         THE COURT:  That was what I meant by mental health
```

F859LIPS

1      condition.

2              MR. GALLER:  Yes.  And either we or the government can

3      make those arrangements.  Certainly Dr. Goldstein can help in

4      that regard.

5              THE COURT:  Although the probation department has

6      resources and I'm sure we'd consult with all of the resources.

7              MR. GALLER:  And home confinement is reasonable under

8      the circumstances.  I think the setting is safer for my client

9      and will cause less of a problem and less stress.  So for all

10     of those reasons I would ask that the sentence be limited to

11     that and I thank you for your attention, your Honor.

12             THE COURT:  Thank you, Mr. Galler.

13             Mr. Abramowicz.

14             MR. ABRAMOWICZ:  Your Honor, I think there are two

15     central themes that came through from defense counsel's remarks

16     just now.  These are also themes that emerge in the defense's

17     submission.  Those themes are:  One, the culpability of Bernard

18     Madoff; and two, the issues concerning Mr. Lipkin's health.

19     I'd like to talk about those in turn.  Focusing first on

20     Bernard Madoff.

21             By now fifteen people have come in and either pled

22     guilty or been found guilty by a jury for their involvement in

23     this massive fraud and only one of those people was named

24     Bernard Madoff.  And there is no dispute that Bernard Madoff

25     was the most culpable.  He was the worst of the fifteen and he

F859LIPS

deserved the harshest punishment and he got it.  I'm not here

asking the court to sentence Mr. Lipkin to 150 years in prison.

But there's a lesson from what we've seen over the years and

the lesson from this parade of guilty defendants is that

Bernard Madoff did not do this alone.  He probably would have

wanted to do it alone.  He could have kept more of the criminal

proceeds.  He would have decreased the chances that someone

would talk and maybe he'd be found out.  But he didn't do it

alone because he couldn't do it alone.  He needed help and he

found it from people like Irwin Lipkin.

        So I want to refocus us a little bit.  Because we're

not here to talk about what Bernard Madoff did.  We're here to

talk about what Irwin Lipkin did.  I think defense counsel's

statements just now were not entirely consistent with the

statements we heard from Mr. Lipkin himself under oath when he

pled guilty.  Those were statements about what he did and what

he knew he was doing.

        So he said when he pled guilty that he, Mr. Lipkin,

was the comptroller at Madoff Securities.  He was responsible

for preparing and maintaining certain financial books and

records.  He falsified records to manipulate the firm's profit

and loss results.  He altered the general ledger to mislead IRS

auditors and he certified that SEC filings were accurate even

when he knew, not failed to investigate, but knew that they

were not.  And, yes, Mr. Lipkin did a lot of those acts under

F859LIPS

1     the direction of Bernard Madoff.  But he didn't just follow

2     orders.  Mr. Lipkin admitted in court, under oath, that he knew

3     what he was told to do was wrong, he knew it was illegal, and

4     he did it anyway.  Not once.  Not twice.  But over a period of

5     decades.  And beyond that Mr. Lipkin wasn't just being obedient

6     and following orders, because he was also being greedy.

7     Mr. Lipkin did very well for himself for a long time at Madoff

8     Securities.  He was earning approximately $225,000 a year and

9     he retired in 1998, which I think is inconsistent with the idea

10    put forth in the papers that he was merely a clerk.

11          Mr. Lipkin wasn't following orders when he told

12    someone to execute sham trades in his own investment accounts

13    and he was not just following orders when he arranged for

14    himself and for his wife to remain on the Madoff Securities

15    payroll so that they could receive benefits that they weren't

16    entitled to.  So this wasn't just Bernard Madoff's crime.  It

17    was also Irwin Lipkin's crime.

18          Let's talk about Irwin Lipkin's health.  Defense

19    counsel is right that the government agrees that Mr. Lipkin is

20    in poor health.  He is sick.  And his physical condition does

21    qualify him for some departure from the ten-year stipulated

22    sentence.  But departing all the way down from ten years to

23    zero is too drastic.

24          The medical reports that were in defense's submission

25    do establish his poor health but what they don't establish is

F859LIPS

1    that the Bureau of Prisons is incapable of caring for an inmate

2    in Mr. Lipkin's condition.  Defense counsel talked about

3    Dr. Charash's report.  That report says repeatedly that, again,

4    Mr. Lipkin is in poor health but its basic conclusion that it

5    repeats again and again is that he's at great risk of falling

6    and that he's at great risk of suffering severe injury from

7    such a fall.  Your Honor, that's a risk that would exist

8    anywhere and there is no reason why that risk should be worse

9    in prison.  Let's be clear the BOP does not just bus inmates to

10   the nearest prison that has an empty bed.  It evaluates

11   inmates.  It requests and reviews medical records of inmates

12   who are going to be designated to a facility and it designates

13   inmates accordingly.

14          Mr. Lipkin, understandably, wants to keep seeing the

15   doctors he knows.  He understandably wants to be in the comfort

16   of his own home instead of in a facility chosen by the Bureau

17   of Prisons.  But people convicted of serious crimes lose

18   certain liberties and those liberties include the liberty to

19   choose their preferred medical providers.

20          Your Honor, we don't relish coming here to ask you to

21   send a 77-year-old man in Mr. Lipkin's condition to prison.

22   And we don't relish asking you to separate him from his wife

23   who we understand is in poor health, just as we don't relish in

24   many other cases asking courts to sentence defendants who have

25   young children to prison.  But, it's important to remember that

F859LIPS

1   Mr. Lipkin is older than many defendants largely because he was

2   so successful at his crimes.  He got away with this for

3   decades.  So did others.  And as a result he enjoyed his

4   younger years largely at the expense of others and he shouldn't

5   be rewarded for that by being allowed to remain free during his

6   older years.

7            Defense counsel mentioned reducing the risk of

8   recidivism.  We agree.  There is very little to no risk in our

9   view that Mr. Lipkin is going to repeat these offenses or that

10  he'll even have an opportunity to repeat these offenses.  But

11  there are other considerations, including the nature and

12  seriousness of the offense, which speaks for itself, and also

13  the need for general deterrence.  And there needs to be a

14  message to people who have dug themselves into a hole from

15  criminal conduct, that they can't just keep digging and keep

16  digging and hope that they can dig long enough to reach old age

17  and just come out free on the other side.

18           So, your Honor, for those reasons and the reasons in

19  our papers we respectfully request that the court sentence

20  Mr. Lipkin to a term of imprisonment, not a term ten years, but

21  some term of imprisonment.  Thank you.

22           THE COURT:  Thank you.

23           Mr. Lipkin, would you like to speak on your own behalf

24  before I decide your sentence?

25           DEFENDANT LIPKIN:  Yes, your Honor.  I was the first

F859LIPS

1   person basically who went to work for Mr. Madoff.  He had two

2   sons and a brother who he told me pointblank they are my future

3   as far as he was concerned.  The fact that Mr. Madoff was well

4   liked and loved on the street, on Wall Street, led me to

5   believe that everything that he had me doing was absolutely on

6   the up and up.  I had no reason to believe otherwise,

7   considering the fact that smarter people than myself were taken

8   in by him, including Congress who he had went up to face at

9   some point in time.

10          During the summer months I had my children coming in

11  to work there.  And, as you know, Eric eventually went to work

12  in the office himself.  If I had known what I know now I would

13  have never done these things to my family.  My family means

14  more to me than anything else in this entire world.  On top of

15  everything else, if I was so smart and knew everything, why

16  would I have given my own money to this man who wound up being

17  the biggest thief on Wall Street?  This to me made absolutely

18  no sense.

19          Insofar as everything else, I would like to apologize

20  to the court and to your Honor and to everybody else who may

21  have been hurt by things that I had done.

22          I would also like to apologize to my own family, my

23  wife, and my three sons for what I had caused them during this

24  period of time.

25          My health has gone down tremendously since this whole

F859LIPS

thing has taken place and I don't know how I can even explain

this to my wife who bears no hardship in the sense that she is

not a well woman.  She has very difficult days.  And it's --

I'm very thankful right now for the fact that my son Mark, who

lives with us, is able to take care of my wife and myself.

         I would really love to turn the clock back but there

is nothing that I can do.  There is nothing that I can really

say anymore since I've just heard it all.  That's the whole

thing in a nutshell.

         Your Honor, I'd like to thank you for caring and

sending information to me pertaining to my health so I really

would like to thank you personally for that.

         Other than that I have nothing else I can really say.

         This gentleman spoke.  I know how he feels and there's

nothing I can do to change his mind.  I can only hope that

possibly you can have sympathy for my wife and my family and

myself and that's all I can really say.  So I really thank you

again for your time and, again, I apologize to you and the

court.

         THE COURT:  Thank you, Mr. Lipkin.

         I do have a question for you, because I am a little

bit puzzled by part of your statement when you talk about what

you did at Madoff Securities.  You admitted in your plea

allocution you changed figures that you had knowingly put false

figures into the reports.  Did you knowingly change figures on

F859LIPS

1   the books of Madoff Securities?

2              DEFENDANT LIPKIN:  To my recollection at this point in

3   time which is going back 17, 18 years, I honestly and truly

4   cannot remember in doing all of those kind of things that I

5   have been accused of doing.

6              THE COURT:  Mr. Galler, do you wish to speak with

7   Mr. Lipkin at all?

8              MR. GALLER:  Just give me one moment.

9              (Pause)

10             MR. GALLER:  Your Honor, I just want to make it clear

11  and maybe I can ask my client a couple of questions to make it

12  more clear to the court.

13             Mr. Lipkin, you're not denying any of the allegations

14  that are in the plea agreement, correct?

15             DEFENDANT LIPKIN:  Correct.

16             MR. GALLER:  And that was done in 2012 with counsel at

17  the time was Mr. Richman, correct?

18             DEFENDANT LIPKIN:  Correct.

19             MR. GALLER:  And you met with Mr. Richman many times,

20  correct?

21             DEFENDANT LIPKIN:  Yes, sir.

22             MR. GALLER:  And you understood that you tried to have

23  trades backdated and signed documents that were not accurate,

24  correct?

25             DEFENDANT LIPKIN:  Yes.

F859LIPS

1          MR. GALLER:  You may not remember the specific ones at

2     this time because of the length of time but you understand that

3     there's nothing that you would argue that is accurate in the

4     November 5, 2012 plea letter, correct?

5          DEFENDANT LIPKIN:  Correct.

6          THE COURT:  You argue that it's not accurate.

7          MR. GALLER:  Right.

8          Everything in there to your knowledge is accurate,

9     correct?

10          DEFENDANT LIPKIN:  Correct.

11          MR. GALLER:  I have nothing further, your Honor.

12          THE COURT:  Did you tell me the truth about your own

13     conduct, Mr. Lipkin, when you pled guilty under oath before me

14     in 2012?

15          DEFENDANT LIPKIN:  Yes, your Honor.

16          THE COURT:  Thank you.  I am going to ask that

17     everyone sit quietly for just a few minutes while I reflect on

18     what I've heard and make my decision regarding the sentence

19     which I will then explain and announce.

20          (Pause)

21          Thank you for your patience.

22          I adopt the factual recitation that is set forth in

23     the presentence report and I further find that Mr. Lipkin

24     suffers from the physical ailments and infirmities and mental

25     health issues detailed in the reports of Doctors Goldstein and

F859LIPS

Charash.

As the Supreme Court has explained in the Booker opinion, this Court has discretion, taking into account the applicable statutory provisions, in exercising its power under Section 3553(a) of Title 18, to determine the particular sentence to be imposed in each particular case.  That statute requires the court to consider a number of specific factors and sentencing goals which include the nature and circumstances of the offense, the defendant's history and characteristics, the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, deterrence, protection of the public, and provision of needed medical care or other correctional treatment to the defendant in the most effective manner.  The Court must also consider the types of sentences available and the applicable sentencing guidelines provisions, among other factors.  The Court is required to impose a sentence that is sufficient but not greater than necessary to comply with the statutory sentencing purposes.

With respect to the Sentencing Guidelines, I conclude that the applicable guideline offense level is 43 and that the applicable Criminal History Category is I for the reasons that are detailed in the presentence report.

I adopt the grouping of charges analysis that is set forth in the presentence report.

F859LIPS

1          Accordingly, the advisory guideline custodial sentence

2     is life imprisonment capped by the combined statutory maximum

3     penalty of ten years, which is also the parties' stipulated

4     guidelines sentence.

5          I have used the November 1, 2014 edition of the

6     Sentencing Guidelines manual in making these determinations.

7          Section 5H1.4 of the guidelines manual contains a

8     policy statement relevant to the Court's determination of

9     whether a defendant's physical condition warrants a departure

10    from the guideline sentence.  That section provides that

11    defendant's physical condition may be relevant in determining

12    whether a departure is warranted if the condition is

13    individually or in combination with other offender

14    characteristics, present to an unusual degree, and

15    distinguishes the case from the typical cases covered by the

16    guidelines, and goes on the state that such an extraordinary

17    physical impairment may be a reason to depart downward and the

18    defendant has the burden of showing that his situation is

19    outside of the heartland of the applicable guidelines.

20         Here, the representations in Mr. Lipkin's submission,

21    particularly the reports, whose findings I have adopted,

22    demonstrate that Mr. Lipkin is frail and is in exceedingly poor

23    health.  The documents detail the array of issues that

24    Mr. Lipkin faces including cardiac and coronary artery related

25    problems, issues arising from medication complications,

F859LIPS

musculoskeletal problems.  As has been mentioned, he wears a

pacemaker and there are balance, ambulation and falling risk

issues.  He has also been diagnosed with mental health

disorders.

The guidelines note that in the case of the seriously

infirmed defendant home detention may be as efficient as and

less costly than imprisonment.

The Court finds that the medical evidence that has

been presented demonstrates that Mr. Lipkin's situation is

outside of the heartland of the applicable guidelines and that

in light of the scope and severity of Mr. Lipkin's condition a

substantial downward departure from the stipulated guideline

sentence of ten years is appropriate.

I have gone on to consider the full range of statutory

sentencing factors and goals under Section 3553 as well as all

of the information that has been put before me in light of

those factors and goals, both the information that was

submitted in writing prior to the sentencing and everything

that has been said here today in court.  And I also note and

take into consideration the fact that Mr. Lipkin has been under

pretrial supervision conditions since late November of 2012.

I will speak relatively briefly to certain of the

factors.

As to the nature and circumstances of the offense.  As

Mr. Lipkin and his counsel have stated, Mr. Lipkin joined

F859LIPS

Madoff Securities now more than 50 years ago as one of its very

first employees and stayed there until he retired in 1998.  He

served as comptroller during that period of time, and in his

capacity as comptroller he, for decades, falsified the books

and records of Madoff Securities, along with other employees

who also participated in that falsification.  And all of this

activity was done at the direction of Mr. Madoff.  But it was

done knowingly.  That included the preparation and filing of

false reports to the Securities and Exchange Commission.

        Mr. Lipkin has acknowledged in his plea allocution,

which he reaffirmed today was the truth, that he knew that the

financial information contained within those reports was false

because he and others had altered that information.  He also

engaged in the falsification of information in aid of

Mr. Madoff's personal tax fraud.  He also engaged in

manipulation of books and records in aid of his own personal

financial situation, including requesting specific tax-related

losses to be shown in the accounting for his investment

accounts at Madoff Securities.  Fake trades were entered in

order to achieve those reported losses.  He also arranged for

his wife to be placed on the company payroll and for himself to

remain on the payroll after he retired in order to collect

benefits to which they were not entitled.  And false documents

were created and filed with the Department of Labor in aid of

that crime, that falsification of employee status.

F859LIPS

1          The Court does recognize and acknowledges that there

2     is no indication that Mr. Lipkin knew that the investment

3     advisory portion of the Madoff Securities business was a Ponzi

4     scheme.  He was not privy to the scope of the client-related

5     fraud but he did knowingly take part in material ongoing

6     massive manipulations of the books and records of that company

7     that were crucial to the perpetration and maintenance of that

8     fraud.

9          Mr. Lipkin is a college graduate and joined Madoff

10    Securities shortly after he graduated from college.

11         Further to his personal characteristics, the letters

12    that I have received from the members of his family show him to

13    be a dedicated family man, one who devoted himself to fathering

14    not only his own children but also nephews and one who did

15    bring his relatives into Madoff Securities thinking that that

16    was a good thing to do.  It is also clear that he did trust

17    Mr. Madoff and he and he family suffered both financial losses

18    and loss of the emotional foundation and confidence in their

19    own integrity and the integrity of his work that was the

20    necessary consequence of the revelation of the Madoff

21    Securities fraud.

22         Mr. Lipkin has expressed remorse here in court and

23    also in his letter to the court, but he minimizes the

24    wrongfulness of his conduct or his recollection of that conduct

25    and the contribution, albeit unwitting, of that conduct to the

F859LIPS

massive destruction of lives that was caused by the Madoff

Securities fraud.

Mr. Lipkin does suffer from a range of very serious

health conditions and his health has been deteriorating in

recent years.  He is fragile and he has compromised ambulation

and cognitive abilities.  He also shares caregiving

responsibilities for Mrs. Lipkin who is also in poor health.

The Court recognizes that Mr. Lipkin has already faced

significant repercussions as a result of his serious criminal

behavior.  He and his family have suffered under the weight of

the judgment of the general public and they have lost

substantial assets.  Mr. Lipkin is subject to a very

substantial I will say forfeiture obligation.  And there is no

question that he will continue to suffer from social isolation

and guilt resulting from the stain of his association and that

of his family with Mr. Madoff and Madoff Securities.

A lengthy custodial term would, absent Mr. Lipkin's

serious health problems and deterioration risks, be appropriate

to address the sentencing considerations of punishment, public

deterrence and promotion of respect for the law.  The Court

has, however, granted the defense motion for a downward

departure pursuant to section 5H1.4 of the guidelines and finds

that, in light of Mr. Lipkin's age, his extraordinarily poor

health and need for frequent specialized medical attention,

that a very substantial departure from the guideline sentence

F859LIPS

to a sentence that includes supervised release with restrictive

special conditions is appropriate here and necessary to achieve

a sentence that is sufficient but not greater than necessary to

address the statutory purposes of sentencing.

            I have considered the full range of Section 3553(a)

factors in determining the appropriate sentence.

            I will now state the sentence that I intend to impose.

            Mr. Lipkin, it is the judgment of this Court that you

are to be sentenced to six months of imprisonment on each of

your two counts of conviction, to be followed by three years of

supervised release with special conditions including 18 months

of home detention.  The custodial terms will run concurrently

for a total of six months of imprisonment and then be followed

by concurrent terms of supervised release for a total of three

years of supervised release, 18 of which will be spent in home

detention.

            The standard conditions of supervision one through

fifteen as detailed in the Sentencing Guidelines Manual will

apply.

            You will also be subject to the following mandatory

conditions.

            You must not commit another federal, state, or local

crime.

            You must not illegally possess a controlled substance.

            You must not possess a firearm or destructive device.

F859LIPS

1            I will suspend the normal mandatory drug testing

2     condition based on the probation office's determination, which

3     I adopt, that you pose a low risk of future substance abuse.

4            You must cooperate in the collection of DNA as

5     directed by the authorities.

6            You must also meet the following special conditions.

7            You must provide the probation officer with access to

8     any requested financial information.

9            You must not incur new credit charges or open

10     additional lines of credit without the approval of the

11     probation officer.

12            You must participate in a mental health program

13     approved by the United States probation office.

14            You must continue to take any prescribed medications

15     unless otherwise instructed by the healthcare provider.

16            And you must contribute to the costs of the services

17     rendered that are not covered by third party payment if you

18     have the ability to pay.

19            The Court authorizes the release of available

20     psychological and psychiatric evaluations and reports to the

21     healthcare provider.

22            You must comply with the conditions of home detention

23     for a period of 18 months.  During this time you must remain at

24     your place of residence except for medical appointments and

25     other activities approved by your probation officer.

F859LIPS

1          You must maintain a telephone at your place of

2     residence that does not have call forwarding, a modem, caller

3     ID, call waiting or portable cordless telephones for this

4     period of time.

5          At the direction of your probation officer you must

6     wear an electronic monitoring device and follow electronic

7     monitoring procedures specified by your probation officer.

8          The home detention will commence on a date to be

9     determined by the probation officer and you must pay the costs

10    of home detention on a self-payment or copayment basis as

11    directed by the probation officer and in light of your

12    financial circumstances.

13         You must report to the nearest probation office within

14    72 hours of release from custody and you will be supervised by

15    your district of residence.

16         I will not impose a restitution obligation for the

17    reasons set forth in the order that I entered in this case on

18    January 22, 2013.

19         I will order you, consistent with the terms of the

20    consent preliminary order of forfeiture, to forfeit to the

21    United States $170 billion in respect of your convictions on

22    Counts One and Two representing the proceeds received directly

23    or indirectly from those crimes.

24         You must also forfeit to the United States all right,

25    title, and interest in the specific property identified for

F859LIPS

1    forfeited in the consent preliminary order of forfeiture.

2           Your forfeiture obligation will be joint and several

3    with those of Daniel Bonventre, Annette Bongiorno, JoAnn Crupi,

4    George Perez, Jerome O'Hara, Eric S. Lipkin, David Kugel,

5    Enrica Cotellessa-Pitz, Craig Kugel, Peter Madoff and Paul J.

6    Konigsberg -- actually Mr. Konigsberg's forfeiture obligation

7    isn't joint and several, is it?

8           MR. MONTELEONI:  Your Honor, I believe it was joint

9    and several but in an amount that it was satisfied.  So, yes, I

10   think that it is.

11          THE COURT:  He's properly included?

12          MR. MONTELEONI:  Yes.

13          THE COURT:  I'm sorry.  I thought it had a different

14   calculation basis.

15          Paul J. Konigsberg, all in this case, which is

16   10 CR 228; that of Bernard Madoff in 9 CR 213-01; that of David

17   Friehling in 09 CR 700; and any of Frank DiPascali in

18   09 CR 764.

19          I will order that you pay to the United States the

20   mandatory special assessment of $200 which is $100 for each of

21   the counts of conviction and that is due immediately.

22          In light of your forfeiture obligation I will not

23   impose any fine on you.

24          I will recommend to the Bureau of Prisons that you be

25   designated to a medical facility or to home confinement which

F859LIPS

is a designation that is within the power of the Bureau of

Prisons.

If the Bureau of Prisons designates you to home

confinement to serve the six-month sentence, that six months of

home confinement will be in addition to the 18 months of home

confinement that I have imposed as a condition of supervised

release.

I believe that this sentence is reasonable within the

meaning of the law, sufficient, appropriate, and no greater

than necessary to satisfy the statutory purposes of sentencing

which include punishment and deterrence.

Counsel, does either of you know of any legal reason

why the sentence should not be imposed as stated?

MR. ABRAMOWICZ:  No, your Honor.

MR. GALLER:  No, your Honor.

THE COURT:  The sentence as stated is imposed.

Mr. Galler, are there further recommendations that you

would ask that I make to the Bureau of Prisons?

MR. GALLER:  I would like to investigate their current

status.  I know they have a hospital in Kansas City.  I just

don't know where their best medical facility is.  My experience

with someone in his condition in most of the prisons is not

good.  So I would need a little bit of time just to investigate

what the best medical facility would be.  That would have to be

in a near hospital setting because the normal nurse's station

F859LIPS

1    and medical facility in most of the prisons is not adequate.

2              THE COURT:  As I said, I am going to specifically

3    recommend designation to a medical facility as distinguished

4    from a regular prison facility and what I suggest is that you

5    get in touch right away with the designation office of the

6    Bureau of Prisons, provide to the designation office copies of

7    the reports of Doctors Goldstein and Charash so that they can

8    prepare and evaluate appropriately, and they will have the

9    judgment and commitment form that I signed, but also feel free

10   to tell them that I recommended medical facility or home

11   confinement if in their view that is a more appropriate

12   designation.

13             Mr. Lipkin, I must say something important to you

14   about appeal rights.  To the extent that you have not given up

15   your right to appeal through your guilty plea, you have the

16   right to appeal this sentence.  If you are unable to pay the

17   costs of an appeal, you may apply for leave to appeal in forma

18   pauperis.  At your request the clerk of court will file a

19   notice of appeal for you.  Any notice of appeal must be filed

20   within 14 days of the judgment of conviction.

21             I am going to permit time for the evaluation and

22   designation process and so I will direct that Mr. Lipkin report

23   to the designated institution by 2:00 on October 22, 2015.  So

24   that leaves almost three months for the necessary

25   communications and evaluations.

F859LIPS

1          Mr. Abramowicz, are there any remaining counts or

2      underlying indictments that need to be addressed?

3          MR. ABRAMOWICZ:  Your Honor, the government moves to

4      dismiss any and all underlying counts pertaining to Mr. Lipkin.

5          THE COURT:  That motion is granted.

6          Mr. Lipkin, the crimes in which you've participated

7      were serious and you are paying a very heavy price.  In the

8      interruption of your life and your expectations of a quiet

9      retirement, you have much in common with the thousands of

10     victims of the Madoff Securities fraud.  Given your fragile

11     physical condition and your recognition to a significant degree

12     of the wrongfulness of your conduct, the court has concluded

13     that a short period of imprisonment or other custody as

14     directed by the Bureau of Prisons, followed by home confinement

15     is the just and appropriate result here.  You have demonstrated

16     contrition and the letters that I have received about you

17     demonstrate that you are much loved and also relied upon by

18     your family.  And this sentence gives you the opportunity to

19     continue to be a positive force in the lives of others,

20     especially your wife who depends so greatly on you, and I wish

21     you and your family continued strength and courage.  And I

22     thank you for listening.

23         I thank counsel for their work and their advocacy in

24     connection with this case.

25         I will direct that a copy of the presentence report be

F859LIPS

1  prepared for the Bureau of Prisons and the Sentencing

2  Commission.  All other copies of the report must remain

3  appropriately confidential.  If an appeal is taken, counsel on

4  appeal are permitted access to the report.

5          Counsel, is there anything else that we should take up

6  together this afternoon?

7          MR. ABRAMOWICZ:  No, your Honor.

8          MR. GALLER:  Just so we're clear, he doesn't report to

9  probation right away?  I should contact the Bureau of Prisons

10  and then they will interview him and review the records?

11          THE COURT:  He does need to report to probation within

12  the next day or two.  Ms. Ng is going to be e-mailing a report

13  of the sentence to the probation department and that is where

14  the paperwork is commenced.  And so it would be a good idea for

15  you to just touch base and coordinate with probation as to

16  communications within Bureau of Prisons.  My impression is that

17  it's the designation office that you'll principally be dealing

18  with for the Bureau of Prisons but the initial contact has to

19  be with probation.

20          Ms. Ng, are you also going to be giving a printout of

21  that e-mail?

22          THE DEPUTY CLERK:  Yes.

23          THE COURT:  So Ms. Ng will also give a physical copy

24  of the e-mail.  And the probation department is still at 233

25  Broadway, correct, Ms. Ng?

F859LIPS

1          THE DEPUTY CLERK:  Yes.

2          THE COURT:  They're in the process of moving?

3          THE DEPUTY CLERK:  They're in the process of moving.

4          THE COURT:  We haven't been informed that they're

5  here.  Before everybody leaves the courtroom, Ms. Ng, maybe you

6  could just call probation and check to make sure of the right

7  place to report because we certainly wouldn't want to --

8          MR. GALLER:  Because of his circumstances.  It's a few

9  blocks away.  It's just hard for us to get him there today.

10          THE COURT:  Yes.  So Ms. Ng will you just check as to

11  what the appropriate course of action is.

12          MR. GALLER:  Thank you, Judge.

13          THE COURT:  Thank you all.

14          Be well.  We're adjourned.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25